STATE OF CONNECTICUT *v.* ANTHONY J.
BROCUGLIO
(SC 16590)

Borden, Norcott, Katz, Palmer and Zarella, Js.

Argued April 16—officially released July 22, 2003

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Adam Scott*, assistant state's attorney, for the appellant (state).

*Jon L. Schoenhorn*, special public defender, for the appellee (defendant).

*Opinion*

KATZ, J. The defendant, Anthony J. Brocuglio, was convicted, after a jury trial, of two counts of interfering with an officer in violation of General Statutes § 53a-167a.[1] The sole issue in this certified appeal[2] is whether the defendant's conduct in response to the police officers' illegal entry[3] into the backyard of his residence

---

[1] General Statutes § 53a-167a (a) provides: "A person is guilty of interfering with an officer when such person obstructs, resists, hinders or endangers any peace officer or firefighter in the performance of such peace officer's or firefighter's duties."

Technical changes were made to § 53a-167a in 2001, after the incident in the present case, changing references to "fireman" to "firefighter" and making the statute gender neutral. See Public Acts 2001, No. 01-84, § 11. For purposes of clarity, we refer herein to the current revision of the statute.

[2] We granted the state's petition for certification, limited to the following issue: "Did the Appellate Court properly conclude that the defendant's conduct did not dissipate the taint from the police officers' illegal entry into the backyard of the defendant's home, and that, therefore, the exclusionary rule regarding the suppression of the evidence derives from that entry?" *State* v. *Brocuglio*, 258 Conn. 908, 908–909, 782 A.2d 1247 (2001).

The defendant also raises two alternate grounds for affirming the Appellate Court's judgment. Because we affirm the judgment, albeit on somewhat different grounds, we need not address these issues.

[3] The state does not contest the determination by the Appellate Court that the officers' entry onto the defendant's property was illegal.

dissipated the taint of the unlawful entry, thereby precluding the defendant from invoking the exclusionary rule to suppress evidence derived from the unlawful entry. The state appeals from the judgment of the Appellate Court, which concluded that the trial court improperly had denied the defendant's motion to suppress on the ground that the defendant's conduct constituted a new crime that broke the chain of causation, dissipating the taint of the unlawful entry. *State* v. *Brocuglio*, 64 Conn. App. 93, 106–108, 779 A.2d 793 (2001). We conclude that, under the exception to the exclusionary rule that we herein adopt, the commission of a new crime dissipates the taint from evidence of that crime obtained as the result of an illegal entry into one's home. We also conclude, however, that because, at the time of the relevant events, the defendant in the present case had a limited common-law right to resist an unlawful, warrantless entry into the backyard of his residence, we cannot apply retroactively the new crime exception to the defendant. We therefore affirm the judgment of the Appellate Court.

The Appellate Court's opinion sets forth the relevant facts and procedural history. "On September 27, 1996, two officers of the East Hartford police department went to the defendant's house at 59 Church Street [in the town of East Hartford (town)], at the request of the East Hartford mayor's office, to ticket abandoned and unregistered vehicles.[4] While they were issuing cita-

[4] "On July 11, 1995, in the Superior Court for the judicial district of Hartford, the town . . . moved to enjoin Ruth Healt, the defendant's wife and the owner of [the property at] 59 Church Street, from violating the town's zoning ordinances by keeping certain vehicles on her property. On September 26, 1996, as a result of pretrial discussions, the town reached an oral agreement with Healt on the zoning matter, and on the presence of registered and unregistered vehicles on her property that were owned by the defendant. The agreement required that six vehicles on Healt's property be brought into compliance with zoning ordinances within fourteen days and that two vehicles be removed or registered within thirty days or be subject to impoundment by the town. The attorney for the town discovered, after the pretrial agreement was made, that a town ordinance required that abandoned

tions, the officers went to areas contiguous to the defendant's residence. The areas consisted of the rear yard, which was protected by a fence, and an unprotected area near the front of the defendant's residence. The ticketing was done pursuant to East Hartford's Code of Ordinances, § 21-1 et seq.[5] The officers had no search warrant, either administrative or otherwise.

"The officers first began to ticket vehicles located in the driveway of the defendant's front yard. While the police were in the front of the house, the defendant's wife came outside and ordered the officers off her property. The officers responded that they had been sent by the town and were acting pursuant to one of [the town] ordinances. The defendant's wife went back inside to call the officers' watch commander, and the defendant came outside. The defendant also ordered the officers off the property. The officers repeated that they were sent by the town and instructed the defendant to call the watch commander.

"In response to the officers' comments, the defendant cursed about the mayor and threatened to bring his dog outside if the officers did not leave. The defendant also claimed that his dog would eat one of the police dogs present at the scene. One officer responded that he would shoot the defendant's dog if he let it come outside. The defendant went inside and returned to the

or unregistered vehicles be ticketed thirty days before impoundment by the town. Thus, the attorney realized that the town could not enforce its agreement with Healt unless it was able to ticket the vehicles that may be subject to impoundment. To effectuate the task of getting the vehicles ticketed, the attorney enlisted the help of the mayor of East Hartford." *State* v. *Brocuglio*, supra, 64 Conn. App. 95–96 n.3.

[5] "Section 21-1 (b) [of the East Hartford code of ordinances], titled, 'Abandoned Vehicles Prohibited,' provides in relevant part: 'No person shall park, store, leave or permit the parking, storing or leaving of any motor vehicle of any kind which is in an abandoned condition whether attended to or not, upon any public or private property within the town. . . .' " *State* v. *Brocuglio*, supra, 64 Conn. App. 96 n.4.

front of the house holding his dog by the collar. One of the officers drew his gun, upon seeing the dog, and ordered the defendant to keep his dog away. The defendant and his dog went back inside the house.

"The officers finished ticketing the vehicles in the front of the house and proceeded to the backyard of 59 Church Street to continue ticketing. To get to the backyard and driveway of the house, the officers had to bypass a six foot tall stockade fence that displayed 'no trespassing' and 'keep out' signs. That fence ran on both sides of the defendant's house. It blocked the back driveway and yard from sight from the street in front of the house. The officers entered through the portion of the fence that extended from the side of the house across the driveway to another home.

"The officers then began ticketing vehicles in the backyard. The defendant and his dog again came outside, this time onto the back porch near where the officers were ticketing. He again threatened to release his dog if the officers did not leave. At that point, according to one of the officers, the defendant took his dog down the back steps and moved toward the two officers, as he yelled profanities and threatened to let his dog go.[6] In response, one officer informed the defendant that he was under arrest. An altercation then ensued between the officers and the defendant." Id., 95–97.

The defendant subsequently was charged in a substitute information with two counts of assault of a peace

---

[6] "It is unclear from the record whether the defendant in fact made threatening advances toward the officers. [One] officer at the scene testified that the defendant remained on the porch. The defendant testified that he remained in the doorway with one foot inside his house and the other on the rear porch landing as he made those comments to the officers. The defendant testified that he was struck from behind by one of the officers when he turned to go back inside." *State* v. *Brocuglio*, supra, 64 Conn. App. 97 n.5.

officer in violation of General Statutes § 53a-167c (a) (1)[7] and three counts of interfering with an officer[8] in violation of § 53a-167a. See footnote 1 of this opinion. The defendant filed a motion to suppress the evidence of "the condition of the vehicles in the backyard, their vehicle identification numbers, the officers' description of the backyard, and the verbal utterances the defendant directed at the officers, in the backyard, including the defendant's alleged threats"; *State* v. *Brocuglio*, supra, 64 Conn. App. 105; claiming that the police officers' entry onto his property violated his rights under the state and federal constitutions. Id., 98. The trial court denied the motion, concluding that the defendant's statements and actions had been voluntary and had not been gathered by any exploitation of any illegality on the part of the police. Therefore, the trial court concluded that the "defendant's independent and intervening actions [had] broke[n] the chain of causation and dissipated the taint of any alleged prior illegality."

Thereafter, following a jury trial, the defendant was convicted of two counts of interfering with an officer. The jury acquitted him of one count of interfering with an officer and one count of assault of a peace officer, and the court granted the defendant's motion for a judgment of acquittal, made at the conclusion of the state's case-in-chief, on the second count of assault of a peace officer. The defendant was sentenced to one

---

[7] General Statutes § 53a-167c (a) provides in relevant part: "A person is guilty of assault of public safety or emergency medical personnel when, with intent to prevent a reasonably identifiable peace officer . . . from performing his or her duties, and while such peace officer . . . is acting in the performance of his or her duties, (1) such person causes physical injury to such peace officer . . . ."

[8] "Toward the end of the altercation between the two officers and the defendant, [a third police] officer arrived at 59 Church Street. That officer assisted the others in 'wrestling' the defendant and putting handcuffs on him." *State* v. *Brocuglio*, supra, 64 Conn. App. 98 n.6.

year incarceration and fined $1500 on one count of interfering with an officer, and sentenced to one year of incarceration, execution suspended, and two consecutive years of probation, on the second count of interfering with an officer. *State* v. *Brocuglio,* supra, 64 Conn. App. 98.

On appeal, the Appellate Court reversed the judgment of the trial court, holding that the trial court improperly had denied the defendant's motion to suppress evidence gathered during the warrantless search and seizure. Id., 95. The Appellate Court recognized that, under federal case law, "[i]f a suspect's response to an illegal search is itself a new, distinct crime . . . the police constitutionally may arrest the [suspect] for that crime . . . [because] that . . . new and distinct crime . . . is a sufficient intervening event to provide independent grounds for arrest." (Internal quotation marks omitted.) Id., 106. The Appellate Court concluded, however, that the defendant's statements requesting that the police leave his property and warning that he would let his dog loose if they did not do so did not constitute a new, distinct crime. Id. The Appellate Court further concluded that the defendant's resistance to the unlawful entry was "ongoing"; id., 108; such that it did not break the chain of causation. Id., 107. Accordingly, the Appellate Court concluded that "the evidence obtained from the time the officers bypassed the fence and entered the back driveway and yard until the time of the defendant's arrest should have been suppressed." Id. As a result, the court remanded the case for a new trial. Id., 108. This certified appeal followed.

The state contends that the Appellate Court improperly concluded that the defendant's conduct was not attenuated sufficiently from the unlawful police conduct to break the chain of causation and to dissipate the taint of the unlawful search. Specifically, the state contends that the defendant's conduct constituted a

new crime subsequent to the unlawful police entry and that this court should apply the new crime exception to the exclusionary rule adopted by many other jurisdictions. Moreover, to the extent that the defendant had any right under the common law to resist an unlawful entry into his home, as set forth in *State* v. *Gallagher*, 191 Conn. 433, 443, 465 A.2d 323 (1983), the state urges this court to overrule that decision. We agree with the state that we should adopt the new crime exception to the exclusionary rule. We further agree that, in accordance with our adoption of that exception, we must overrule *Gallagher*, but only to the extent that it conflicts with our adoption of the new crime exception.

We first set forth the standard of review and legal principles that guide our analysis. "Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Luurtsema*, 262 Conn. 179, 184, 811 A.2d 223 (2002). The Appellate Court determined that, as a matter of law, the trial court improperly had concluded that the defendant's conduct constituted a new crime sufficiently attenuated from the unlawful police entry. Therefore, our review is plenary. See id., 185.

"As a general principle, the exclusionary rule bars the government from introducing at trial evidence obtained in violation of the fourth amendment to the United States constitution." Id., 189. The rule applies to evidence that is derived from unlawful government conduct, which is commonly referred to as the "fruit of the poisonous tree . . . ." (Internal quotation marks

omitted.) *State* v. *Geisler*, 222 Conn. 672, 681–82, 610 A.2d 1225 (1992). In *State* v. *Dukes*, 209 Conn. 98, 115, 547 A.2d 10 (1988), we concluded that article first, § 7, of the Connecticut constitution similarly requires the exclusion of unlawfully seized evidence.

Application of the exclusionary rule, however, is not automatic. "[E]vidence is not to be excluded if the connection between the illegal police conduct and the discovery and seizure of the evidence is so attenuated as to dissipate the taint . . . ." (Internal quotation marks omitted.) *Segura* v. *United States*, 468 U.S. 796, 805, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984). "The United States Supreme Court in *Wong Sun* v. *United States*, [371 U.S. 471, 487–88, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963)], provided an explanation of what is meant by the phrase 'attenuating the taint' . . . . The court stated that, in the context of the fourth amendment, not all evidence 'is fruit of the poisonous tree simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which [the] instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " (Citations omitted.) *State* v. *Luurtsema*, supra, 262 Conn. 190.

The issue of whether a new crime committed in response to an unlawful police entry into one's residence is attenuated sufficiently to break the chain of causation from the unlawful entry is an issue of first impression for this court. Many jurisdictions, however, both federal and state, have considered and adopted a new crime exception to the exclusionary rule. See, e.g., *United States* v. *Sprinkle*, 106 F.3d 613, 619–20 (4th Cir. 1997); *United States* v. *Dawdy*, 46 F.3d 1427, 1431 (8th Cir.), cert. denied, 516 U.S. 872, 116 S. Ct. 195, 133

L. Ed. 2d 130 (1995); *United States* v. *Pryor*, 32 F.3d 1192, 1196 (7th Cir. 1994); *United States* v. *Waupekenay*, 973 F.2d 1533, 1537 (10th Cir. 1992); *United States* v. *Sheppard*, 901 F.2d 1230, 1235 (5th Cir. 1990); *United States* v. *Mitchell*, 812 F.2d 1250, 1254–55 (9th Cir. 1987); *United States* v. *King*, 724 F.2d 253, 256 (1st Cir. 1984); *United States* v. *Bailey*, 691 F.2d 1009, 1013–14 (11th Cir.), cert. denied, 461 U.S. 933, 103 S. Ct. 2098, 77 L. Ed. 2d 306 (1983); *People* v. *Pearson*, 150 Cal. App. 2d 811, 817, 311 P.2d 142 (1957); *Clark* v. *United States*, 755 A.2d 1026, 1030 (D.C. 2000); *State* v. *White*, 642 So. 2d 842, 844 (Fla. App. 1994); *People* v. *Villarreal*, 152 Ill. 2d 368, 380–81, 604 N.E.2d 923 (1992); *Commonwealth* v. *Saia*, 372 Mass. 53, 57–58, 360 N.E.2d 329 (1977); *State* v. *Bale*, 267 N.W.2d 730, 732–33 (Minn. 1978); *People* v. *Puglisi*, 51 App. Div. 2d 695, 380 N.Y.S.2d 221 (1976); *State* v. *Miller*, 282 N.C. 633, 641–42, 194 S.E.2d 353 (1973); *State* v. *Saavedra*, 396 N.W.2d 304, 305 (N.D. 1986); *State* v. *Burger*, 55 Or. App. 712, 715–18, 639 P.2d 706 (1982); *State* v. *Miskimins*, 435 N.W.2d 217, 222 (S.D. 1989); *State* v. *Mierz*, 127 Wash. 2d 460, 473–75, 901 P.2d 286 (1995). Several rationales have been advanced for application of the new crime exception: (1) the defendant has a diminished expectation of privacy in the presence of police officers; (2) the defendant's intervening act is so separate and distinct from the illegal entry so as to break the causal chain; and (3) the limited objective of the exclusionary rule is to deter unlawful police conduct—not to provide citizens with a shield so as to afford an unfettered right to threaten or harm police officers in response to the illegality. *United States* v. *Waupekenay*, supra, 1538.

In our view, the policy concerns underlying the third rationale present a persuasive reason for adopting the exception to the exclusionary rule. We agree with the United States Court of Appeals for the Seventh Circuit that "the gains from extending the [exclusionary] rule

to exclude evidence of fresh crimes are small, and the costs high. If the rule were applied rigorously, suspects could shoot the arresting officers without risk of prosecution. An exclusionary rule that does little to reduce the number of unlawful seizures, and much to increase the volume of crime, cannot be justified." *United States* v. *Pryor*, supra, 32 F.3d 1196; see also *State* v. *Miller*, supra, 282 N.C. 641 ("[a]lthough wrongfully on the premises, officers do not thereby become unprotected legal targets"); *State* v. *Burger*, supra, 55 Or. App. 716 ("a person who correctly believed that his home had been unlawfully entered by the police could respond with unlimited force and, under the exclusionary rule, could be effectively immunized from criminal responsibility for any action taken after that entry"); *State* v. *Miskimins*, supra, 435 N.W.2d 222 ("[w]hile this court recognizes the sanctity of the home, the right to live in peace therein and to be free from illegal governmental interference, these rights do not extend to turn a home into a free-fire zone against the police on whim"). Indeed, there is a greater risk of escalating violence when citizens are permitted to use, or threaten to use, force to respond to unlawful police conduct.[9] This concern is especially true considering that law enforcement officers typically are equipped with firearms, and that a violent response to an illegal search may well result in a tragic outcome.

Moreover, from a public policy standpoint, issues arising from illegal entries are best remedied in the courtroom. To be sure, there already exist legal remedies available to victims of unlawful police actions. First, a victim of such illegality may preclude the police from taking advantage of the illegally obtained evidence

---

[9] Indeed, as our review of the exhibits in the present case reveals, as a result of the altercation between the defendant and the police officers, one of the officers received scratches, and the defendant was treated at a local hospital for, among other injuries, dog bites and a shattered eye socket.

by invoking the protections of the exclusionary rule. *State* v. *Geisler*, supra, 222 Conn. 690. Indeed, the defendant in the present case properly could have invoked the exclusionary rule to suppress the evidence regarding the vehicles that the police had obtained while unlawfully present in the defendant's backyard. Second, a victim of an illegal entry properly may file a civil action seeking a declaratory judgment, injunctive relief or, in certain circumstances, damages against the officers in their official or individual capacity. See 42 U.S.C. § 1983 (1994);[10] *Monell* v. *Dept. of Social Services*, 436 U.S. 658, 690, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978) ("[l]ocal governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers"); *Binette* v. *Sabo*, 244 Conn. 23, 41–43, 710 A.2d 688 (1998) (in action against municipal police officers, creating action in tort for damages from unlawful search and seizure under article first, §§ 7 and 9, of Connecticut constitution). Accordingly, in light of the defendant's ability to obtain relief to protect his constitutional rights and the public policy concerns regarding escalating violence, we hereby adopt the new crime exception to the exclusionary rule.[11]

---

[10] Section 1983 of title 42 of the United States Code provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

[11] Our adoption of the new crime exception, however, is not intended to provide the police with the unfettered ability to engage recklessly in illegal searches in the hopes of provoking a defendant to commit a new crime and, subsequently, to have evidence thereby obtained admitted under the exception. Indeed, the United States Court of Appeals for the Ninth Circuit has declined to apply the new crime exception in such instances, noting that "[w]hen it is claimed that the police have exploited an illegal arrest by

Although it appears that the defendant's actions and words during the illegal search would fall under the new crime exception, despite the Appellate Court's conclusion to the contrary; see *State* v. *Brocuglio*, supra, 64 Conn. App. 106; the defendant contends, nevertheless, that under *State* v. *Gallagher*, supra, 191 Conn. 433, he had a common-law privilege to resist an illegal entry into his home, including his backyard, and therefore his actions did not constitute a new crime. The state maintains that the defendant's threats and verbal interference with the police officers are not privileged at common law.

In *Gallagher*, this court confirmed the existence of a limited common-law right reasonably to resist an unlawful and warrantless search of a home. Id., 443. In that case, the defendant had made an insulting remark to a neighbor, who then called the police and asked that the defendant be arrested. Id., 435. A police officer arrived on the scene approximately one hour later, spoke with the neighbor, and radioed for backup assistance on a possible arrest. Id. Then, without a warrant, the officer knocked on the defendant's door and informed the defendant and his wife that he was investigating a neighborhood incident. Id., 436. They invited him in, and thereafter the officer asked the defendant whether he had made the alleged remark to his neighbor, which the defendant denied. Id. When the defen-

---

creating a situation in which a given criminal response is predictable . . . a better approach would be to determine whether the government's prosecution of the crime would abridge fundamental protections against unfair treatment." *United States* v. *Mitchell*, supra, 812 F.2d 1254. Because we conclude herein that the new crime exception cannot be applied retroactively to the defendant, and because we have no expectation that the police intentionally will abuse this exception, we need not consider whether to engraft a bad faith limitation onto the new crime exception, as the Ninth Circuit has done, nor whether such an exception would apply in this case, in light of the fact that the officers knowingly entered the defendant's property without a warrant and refused to heed his requests to vacate the premises, as was his right to do.

dant refused the officer's request to step outside to discuss the incident, the officer placed his hand on the defendant's arm, and informed him that he was under arrest for breach of the peace. Id. The defendant responded by pulling his arm away from the officer and backing away into the house. Id. When the officer approached the defendant, the defendant raised his fist, and the officer then kicked the defendant in the groin. Id. The defendant thereafter was brought to the police station; id., 437; and, following a jury trial, was convicted of interfering with an officer. Id., 434, 436 n.3.

On appeal, we reversed the trial court's judgment on the ground that it improperly had refused the defendant's request to instruct the jury that Connecticut recognizes a common-law right to resist an unlawful, warrantless entry into one's home. Id., 445. We first recognized the seriousness of the government's intrusion in light of the privacy interest that attaches to one's home. Id., 440. We also noted that, although the legislature had abrogated the common-law right to resist an unlawful *arrest*; see General Statutes § 53a-23; it had not done so with respect to the common-law right to resist an unlawful *entry*. *State* v. *Gallagher*, supra, 191 Conn. 441. Finally, we recognized that, although certain arguments "reinforce the policy that private resistance to governmental action is to be discouraged, they cannot totally negate the contrary rule. We will continue to adhere to the common law view that there are circumstances where unlawful warrantless intrusion into the home creates a privilege to resist, and that punishment of such resistance is therefore improper." Id., 442. Accordingly, we "refused to abrogate the common law privilege to offer reasonable resistance, *not rising to the level of an assault,*[12] to an unlawful entry." (Emphasis added.) Id., 443.

---

[12] Although we did not explicitly state so in our decision in *Gallagher*, the assault to which we referred therein is that crime as defined under our Penal Code; see General Statutes § 53a-167c; and not assault under the common law.

We recognize that our adoption of the new crime exception to the exclusionary rule conflicts with the common-law privilege to resist an unlawful entry into one's home, as set forth in *Gallagher.* The state urges us to overrule *Gallagher* in its entirety. We decline the state's invitation and conclude that the better course is to overrule *Gallagher* only to the extent that it conflicts with the new crime exception. In other words, the right to challenge an illegal entry remains a privilege, provided no new crime is committed.

In modifying *Gallagher,* we are not unmindful of the important role that the doctrine of stare decisis plays in our system of justice. That doctrine, however, is not an end in itself. "Principles of law which serve one generation well may, by reason of changing conditions, disserve a later one. . . . Experience can and often does demonstrate that a rule, once believed sound, needs modification to serve justice better." (Citations omitted.) *Herald Publishing Co.* v. *Bill,* 142 Conn. 53, 62, 111 A.2d 4 (1955). "The flexibility and capacity of the common law is its genius for growth and adaptation." *State* v. *Dabkowski,* 199 Conn. 193, 199, 506 A.2d 118 (1986). For the reasons we provided previously in this opinion, we conclude that our prior rule no longer provides the most appropriate accommodation between the competing interests involved in cases of this sort. This court is charged with the ongoing responsibility to revisit our common-law doctrines when the need arises. See, e.g., *State* v. *Troupe,* 237 Conn. 284, 304, 677 A.2d 917 (1996) (modification of common-law constancy of accusation doctrine to address modern day and competing considerations by narrowing doctrine to allow introduction of testimony regarding fact and timing, but not details, of victim's sexual assault complaint).

Therefore, we hold that the common-law privilege to challenge an unlawful entry into one's home still exists

to the extent that a person's conduct does not rise to the level of a crime.[13] In light of our limitation of *Gallagher*, however, the defendant's conduct in violating § 53a-167a would fall outside the common-law privilege. Accordingly, under the new crime exception to the exclusionary rule, the evidence relating to the defendant's statements and actions with regard to the crime of interfering with an officer would be admissible. Because of the constitutional implications of such a result, however, we decline to apply retroactively the new crime exception to the defendant.

In *Rogers* v. *Tennessee*, 532 U.S. 451, 462, 121 S. Ct. 1693, 149 L. Ed. 2d 6967 (2001), the United States Supreme Court reaffirmed the principle, previously articulated in *Bouie* v. *Columbia*, 378 U.S. 347, 354, 84 S. Ct. 1697, 12 L. Ed. 2d 894 (1964), that "a judicial alteration of a common law doctrine of criminal law violates the [due process] principle of fair warning, and hence must not be given retroactive effect, only where it is unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue." (Internal quotation marks omitted.) The *Rogers* case involved a claim that the Tennessee Supreme Court's retroactive application of its decision abolishing that state's common-law rule that no defendant could be convicted of murder unless the victim died within one year and a day of the act (year and a day rule) denied the defendant's right to due process under the fourteenth amendment to the United States constitution. *Rogers* v. *Tennessee*, supra, 453. In affirming the petitioner's conviction, the United States Supreme Court concluded that "[t]here is, in short, nothing to

---

[13] Although our holding circumscribes the type of behavior in which one may engage, because we decline to apply this new rule to the defendant in this case, we conclude that it is unnecessary at this juncture to state precisely the scope and nature of permissible conduct. We leave those issues for another day.

indicate that the Tennessee court's abolition of the rule in [the] petitioner's case represented an exercise of the sort of unfair and arbitrary judicial action against which the Due Process Clause aims to protect. Far from a marked and unpredictable departure from prior precedent, the court's decision was a routine exercise of common law decisionmaking in which the court brought the law into conformity with reason and common sense. It did so by laying to rest an archaic and outdated rule that had never been relied upon as a ground of decision in any reported Tennessee case." Id., 466–67.

Unlike abolishing the year and a day rule in *Rogers*, we recognize that, by adopting the new crime exception to the exclusionary rule in this case, we are deviating from numerous cases by our appellate courts recognizing the validity and vitality of the common-law right to resist an unlawful entry into one's home as set forth in *State* v. *Gallagher*, supra, 191 Conn. 443. See, e.g., *State* v. *Casanova*, 255 Conn. 581, 587 n.7, 767 A.2d 1189 (2001); *State* v. *Geisler*, 222 Conn. 672, 689, 610 A.2d 1225 (1992); *State* v. *Brosnan*, 221 Conn. 788, 795–96, 608 A.2d 49 (1992); *State* v. *Capozziello*, 21 Conn. App. 326, 330 n.2, 573 A.2d 344, cert. denied, 215 Conn. 816, 576 A.2d 545 (1990); *State* v. *Privitera*, 1 Conn. App. 709, 718, 476 A.2d 605 (1984). This departure from our well established precedent is both marked and unpredictable.

Therefore, we conclude that application of the new crime exception to the defendant in the present case would violate the principles of fair warning. Under *Gallagher*, the defendant here had a common-law right to resist, short of committing an assault, an illegal entry by the police into his home. Therefore, at the time of the illegal entry, his resistance, as long as it did not rise to the level of assault, did not violate the law. There is no evidence that the defendant assaulted the police

officers conducting the search; indeed, to the contrary, the jury *acquitted* him of that very charge. Moreover, at the time of the illegal entry, the evidence gathered by the police officers, without which the defendant could not have been convicted, would have been inadmissible under the exclusionary rule because the new crime exception to that rule had not yet been adopted. It follows, therefore, that application of the new crime exception would expose the defendant, without fair notice, to criminal liability for conduct that was sanctioned by the common law at the time of the incident. We, therefore, constitutionally can not apply the new crime exception retroactively to the defendant.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.