******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## STATE OF CONNECTICUT *v.* BRUSHAUN THOMPSON-BAKER
### (AC 46871)

Elgo, Suarez and Seeley, Js.

*Syllabus*

Convicted of assault of public safety personnel, the defendant appealed to this court. The defendant claimed that the evidence was insufficient to support a finding beyond a reasonable doubt that, when he assaulted K, a judicial marshal, K was acting in the performance of his official duties. *Held*:

The trial court reasonably concluded that the evidence and the reasonable inferences drawn therefrom demonstrated beyond a reasonable doubt that K was acting in the performance of his duties when the defendant assaulted him because K and another judicial marshal testified that they had accompanied the defendant from the courthouse, where he had been arraigned, to a hospital, that he guarded the defendant at the hospital, and that K informed the defendant and hospital staff that the defendant was not permitted to eat, and that he did so pursuant to a judicial directive prohibiting the consumption of food by inmates while at a hospital, which prompted the defendant to spit in K's right eye.

The trial court reasonably could have found that K denied the defendant access to food because he had a good faith, albeit erroneous, belief that a judicial directive prohibited the consumption of food by inmates while at a hospital, and this court declined to conclude that K had testified untruthfully, acted in bad faith or was otherwise engaged in a personal frolic, as such a conclusion would substitute its own judgment for that of the trier of fact, which evaluated the evidence and the witnesses' credibility firsthand.

Argued November 14, 2024—officially released March 4, 2025

*Procedural History*

Two part substitute information charging the defendant, in the first part, with the crime of assault of public safety personnel, and, in the second part, with being a persistent serious felony offender, brought to the Superior Court in the judicial district of Fairfield, where the first part of the information was tried to the court, *E. Richards, J.*; finding of guilty; thereafter, the second part of the information was tried to the court, *E. Richards, J.;* finding that the defendant was a persistent serious felony offender; judgment of guilty and sentence

enhanced for being a persistent serious felony offender, from which the defendant appealed to this court. *Affirmed.*

*Gary A. Mastronardi*, assigned counsel, for the appellant (defendant).

*Olivia M. Hally*, deputy assistant state's attorney, with whom, on the brief, were *Joseph Corradino*, state's attorney, and *Michael DeJoseph*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SUAREZ, J. The defendant, Brushaun Thompson-Baker, appeals from the judgment of conviction rendered by the trial court of assault of public safety personnel in violation of General Statutes § 53a-167c (a) (5). On appeal, the defendant claims that the evidence was insufficient to support a finding beyond a reasonable doubt that, when he assaulted a judicial marshal, the marshal was acting in the performance of his official duties.[1] We affirm the judgment of the trial court.

The following evidence was presented at trial. On June 9, 2022, the defendant, having been arrested the previous day, was brought to the courthouse in the judicial district of Fairfield at Bridgeport, geographical area number two (G.A. 2), for the purposes of arraignment. After the defendant's arraignment, he became agitated and aggressive. He yelled obscenities, talked over both the judge and his public defender, and threatened McKenzie Bushnell, one of the judicial marshals who escorted him from the courtroom back to the holding cell. Specifically, the defendant referred to Bushnell

---

[1] In his principal appellate brief, the defendant also claimed that the court improperly imposed on him a sentence involving a period of special parole under General Statutes § 54-125e (b) (1). In his reply brief, the defendant withdrew this claim.

as a "bitch," and stated that he was going to remember her and that she was "not to fucking touch him . . . ."

Later that morning, the defendant was transported by ambulance from G.A. 2 to St. Vincent's Medical Center in Bridgeport in connection with an unspecified illness. He was accompanied by two judicial marshals, Jason Kramer and Joshua Dalby. The defendant appeared to be agitated while at the hospital; he yelled at medical staff members and demanded that they identify themselves and their supervisors. The defendant requested food from the hospital staff, but Kramer informed both the defendant and the attending nurse that the defendant was not permitted to consume food while at the hospital, although he was permitted to drink water.

Upon being informed that he was not allowed to eat, the defendant became even more aggressive in his words and conduct by standing face-to-face with Kramer and backing him against the hospital room door. In response, Dalby physically inserted himself between the defendant and Kramer. The defendant then called Kramer "[a] fucking cracker," said "I'm going to fuck you up," and spat in his right eye. Immediately after spitting on Kramer, the defendant made several hostile comments. According to Kramer and Dalby, the defendant stated: "I spit on him, yes, I did. I will take the charge"; "it's only six months, I can take that"; "it probably won't stick, there's no cameras"; "[I'll] meet [Kramer] at 5:01 when he gets off of work"; and "[I'm] going to fuck him up after work."

Thereafter, the defendant was arrested and charged with assault of a public safety officer.[2] The defendant pleaded not guilty, waived his right to a jury trial, and elected to be tried by the court. At trial, the prosecutor

---

[2] The defendant also was charged, in a part B information, with being a persistent serious felony offender pursuant to General Statutes § 53a-40 (c).

presented testimony from three witnesses: Bushnell, Kramer, and Dalby. After the prosecutor rested the state's case-in-chief, defense counsel offered as the defense's sole evidence a stipulation that the state judicial marshals' handbook (handbook) does not contain any directive or guidance prohibiting "an inmate who is at the hospital from receiving food from the hospital."[3] The prosecutor agreed to this stipulation, and the defense rested.

The court then issued its ruling, finding the defendant guilty of assault of a public safety officer and setting forth the following findings: "The court has listened to testimony and arguments of counsel. The court has also reviewed and considered all applicable statutes, testimony and arguments of counsel in deliberations upon this matter. . . . The court finds that, on June 9, 2022, the defendant was being transported to St. Vincent's Medical Center . . . from G.A. 2 in Bridgeport to address an unspecified illness. The defendant was in the care of . . . Marshal[s] . . . Kramer and . . . Dalby. At approximately 11 a.m., testimony reveals that the defendant spit in the eye of [Kramer] during an altercation.

"That the defendant specifically intended to prevent [Kramer] from performing his lawful duties was established by the inference drawn from the facts. . . . [T]hat the defendant was . . . in the custody of [Kramer]. That he became upset with [Kramer] when [Kramer] refused to give him his sandwich. That he called [Kramer] a cracker and threatened to kick his

---

[3] Specifically, when offering the stipulation, defense counsel stated that he "had the opportunity to speak to . . . Lieutenant Greenbay . . . who was kind enough to review the marshals' handbook with—with the chief in this—in this building. And, I've been advised that there is no directive or guidance which prohibits an inmate who is at the hospital from receiving food from the hospital."

ass. And that, according to [Kramer] and [Dalby], the defendant spit in [Kramer's] eye.

"All of these factors support a finding that the defendant specifically intended, in the court's mind, to prevent a readily identifiable marshal from carrying out his lawful duties in this case by spitting in his face. As a result, the court finds that the state has proven beyond a reasonable doubt the assault [of] public safety [personnel] count."[4]

On May 31, 2023, the court sentenced the defendant to twenty-seven months of incarceration, followed by ten years of special parole. This appeal followed.

We set forth our standard of review and the relevant legal principles. "When a criminal conviction is reviewed for the sufficiency of the evidence, we apply a well established [two part] test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [trier of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . [P]roof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [trier of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [trier of fact's] verdict of guilty. . . .

---

[4] Following the court's decision on the assault charge, the defendant was found to be a persistent serious felony offender pursuant to General Statutes § 53a-40 (c).

"Our review is a fact based inquiry limited to determining whether the inferences drawn by the [trier of fact] are so unreasonable as to be unjustifiable. . . . [T]he inquiry into whether the record evidence would support a finding of guilt beyond a reasonable doubt does not require a court to ask itself whether it believes that the evidence . . . established guilt beyond a reasonable doubt. . . . Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Citation omitted; internal quotation marks omitted.) *State* v. *Kyle A.*, 212 Conn. App. 239, 245–46, 274 A.3d 896 (2022), aff'd, 348 Conn. 437, 307 A.3d 249 (2024).

"[W]e give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses. . . . In evaluating evidence that could yield contrary inferences, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier [of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Dunbar*, 165 Conn. App. 93, 97, 138 A.3d 455 (2016). "[W]e do not substitute our own judgment for that of the [trier of fact] if there is sufficient evidence to support its verdict." *State* v. *Terry*, 161 Conn. App. 797, 808, 128 A.3d 958 (2015), cert. denied, 320 Conn. 916, 131 A.3d 751 (2016).

Section 53a-167c (a) provides in relevant part: "A person is guilty of assault of public safety . . . personnel when, with intent to prevent a reasonably identifiable peace officer . . . from performing his or her duties, and while such peace officer . . . is acting in

the performance of his or her duties . . . (5) such person throws or hurls, or causes to be thrown or hurled, any bodily fluid including, but not limited to, urine, feces, blood or saliva at such peace officer . . . ."[5] Under this statute, the state, therefore, was required to prove the following essential elements beyond a reasonable doubt: (1) the defendant assaulted a reasonably identifiable judicial marshal, (2) the assault occurred while the judicial marshal was acting in the performance of his official duties, (3) the defendant acted with the specific intent to prevent the judicial marshal from performing his lawful duties, and (4) the defendant threw or hurled, or caused to be thrown or hurled, any bodily fluid at the judicial marshal. See Connecticut Criminal Jury Instructions 4.3-3, available at https:// www.jud.ct.gov/JI/Criminal/Criminal.pdf (last visited February 18, 2025).

"The question of [w]hether [a judicial marshal] is acting in the performance of his duty within the meaning of . . . [§ 53a-167c (a)] . . . must be determined in the light of that purpose and duty. If he is acting under a good faith belief that he is carrying out that duty, and if his actions are reasonably designed to that end, he is acting in the performance of his duties. . . . The phrase in the performance of his official duties means that the . . . [judicial marshal] is simply acting within the scope of what [he] is employed to do. The test is whether the [judicial marshal] is acting within that compass or is engaging in a personal frolic of his own. . . . [W]hether the . . . [judicial marshal] was acting in the performance of his official duties or engaging in a personal frolic [are] factual questions for the [trier of fact] to determine on the basis of all the circumstances

---

[5] A "[p]eace officer" is defined, inter alia, to include "a judicial marshal in the performance of the duties of a judicial marshal . . . ." General Statutes § 53a-3 (9).

of the case . . . .” (Footnote omitted; internal quotation marks omitted.) *State* v. *Mansfield*, 201 Conn. App. 748, 768, 243 A.3d 822 (2020), cert. denied, 336 Conn. 910, 244 A.3d 561 (2021).

In the present case, the defendant challenges only whether the state proved beyond a reasonable doubt that the assault occurred while Kramer was acting in the performance of his official duties as a judicial marshal. The defendant argues that the court erred in finding that Kramer was acting in the performance of his official duties when he told the hospital staff that the defendant could not consume food while at the hospital, and that Kramer, instead, deliberately provoked the defendant’s outburst as part of a personal frolic. Moreover, the defendant argues that, to the extent that Kramer testified at trial that he believed that an official policy supported his denial of food, Kramer committed perjury. The defendant also contends that, in concluding that this essential element had been proven beyond a reasonable doubt, the court improperly relied solely on its finding that the assault occurred while he was in the care and custody of Kramer.

The following additional evidence is relevant to our analysis. At trial, Kramer testified regarding his training and experience as a judicial marshal. He further testified that he accompanied the defendant to the hospital, that he guarded the defendant at the hospital, that he informed the defendant and the attending nurse that the defendant was not allowed food while at the hospital, and that the defendant subsequently spat in his eye. During the prosecutor’s direct examination of Kramer, the following colloquy occurred regarding Kramer’s reasoning for denying food to the defendant:

“Q. All right. And why was [the defendant] not allowed to have any food or nonwater beverage provided by the hospital?

"A. First of all, I think it could interfere with the medical staff providing medical care. But it also comes from a directive from the Judicial Branch and Judicial Marshal Services.

"Q. So, the higher-ups in Judicial Marshal Services have instructed the other marshals not to allow an inmate to consume food or a nonwater beverage while at the hospital?

"A. Yes.

"Q. Okay. And did you follow that directive?

"A. Yes."

On cross-examination, Kramer testified that "[he didn't] know the exact policy number or directive, but it's—it's in the policy and directives."

Dalby testified regarding his experience and training as a marshal, that he had accompanied the defendant to the hospital and guarded him at the hospital, that Kramer had denied the defendant's request for food, and that the defendant subsequently spat on Kramer. When questioned on direct examination regarding a prohibition on inmates consuming food while at the hospital, Dalby testified that "there is a guideline through the judicial guidelines . . . ." On cross-examination, the following exchange occurred between defense counsel and Dalby:

"Q. [Kramer] indicated the only thing that could be provided to [the defendant] was water—

"A. Okay.

"Q. —is that correct?

"A. I believe so, based on those guidelines."

We first address the defendant's contention that the court improperly based its finding that Kramer was

acting in the performance of his official duties solely on the fact that the assault occurred while the defendant was in Kramer's care and custody at the hospital. The defendant correctly argues that this finding, on its own, improperly would lead to an overbroad conclusion that all of a judicial marshal's conduct while an inmate is in his care and custody occurs in the performance of an official duty. See, e.g., *State* v. *Casanova*, 255 Conn. 581, 596, 767 A.2d 1189 (2001) (characterizing as overbroad state's belief that any conduct by police officer properly dispatched to scene should be considered within performance of his or her official duties), overruled in part on other grounds by *State* v. *Brocuglio*, 264 Conn. 778, 826 A.2d 145 (2003).

In the present case, the court did not specifically set forth the basis for its conclusion that Kramer was acting in his official capacity. Contrary to the defendant's assertion, we do not interpret the court's decision to suggest that the court based this conclusion on any one fact, let alone solely on its finding that the assault occurred while the defendant was in the care and custody of Kramer. The court's finding that the defendant was in the care and custody of Kramer at the time of the assault was relevant to, but was not dispositive of, its determination of whether the assault occurred while Kramer was acting in the performance of his official duties as a judicial marshal. It is well settled that "[w]e do not presume error; the trial court's ruling is entitled to the reasonable presumption that it is correct unless the party challenging the ruling has satisfied its burden demonstrating the contrary." *State* v. *Crumpton*, 202 Conn. 224, 231, 520 A.2d 226 (1987).

Viewing the evidence in the light most favorable to sustaining the trial court's judgment, we conclude that the totality of the evidence presented, including the reasonable inferences therefrom, supports a finding that the state proved beyond a reasonable doubt that

Kramer was acting in the performance of his duties as a judicial marshal when the defendant spat in his eye. Kramer and Dalby both testified that they had been tasked with accompanying the defendant from the courthouse to the hospital and guarding him while he was there. Kramer testified that he informed the defendant and the attending nurse that the defendant was not permitted to eat, and that he did so pursuant to a judicial directive prohibiting the consumption of food by inmates while at the hospital, which prompted an outburst from the defendant that culminated in him spitting in Kramer's eye. Dalby also testified as to his belief that there was a judicial directive or guideline prohibiting inmates from consuming food while at the hospital and that the defendant's assault on Kramer was prompted by Kramer informing the defendant that he was not permitted to eat.

The evidence that such a directive did not exist in the handbook does not necessarily lead to an inference that Kramer testified untruthfully or that he did not act pursuant to a good faith belief that he was carrying out his duties. Rather, on the basis of the evidence presented, the court reasonably could have found that Kramer denied the defendant access to food because he had a good faith, albeit erroneous, belief that there was a judicial directive prohibiting the consumption of food by inmates while at the hospital, or that the prohibition at issue existed but was not codified in the handbook.[6] The stipulation offered was that no directive or other guidance within the handbook prohibits inmates from consuming food while at the hospital. The

---

[6] We note that Kramer did not testify conclusively with respect to whether the prohibition at issue necessarily appeared in the handbook. During his direct examination, Kramer testified as to his belief that "higher-ups in Judicial Marshal Services [had] instructed the other marshals" to prohibit inmates from consuming food while they were at the hospital. During his cross-examination, he testified that the prohibition had been set forth "in the policy and directives."

stipulation did not provide that the handbook was the exclusive repository for every guideline, policy or directive governing the official duties of the marshals. The stipulation also left unanswered the question of whether this prohibition was communicated to Kramer in oral or any other form. Further, the stipulation does not address whether Kramer simply misunderstood the policy. For this court to conclude that Kramer testified untruthfully, acted in bad faith, or was otherwise engaged in a personal frolic, would be to substitute our own judgment for that of the trial court and to ignore the deference owed to the trier of fact that evaluated the evidence and witnesses' credibility firsthand. See *State* v. *Dunbar*, supra, 165 Conn. App. 97; *State* v. *Terry*, supra, 161 Conn. App. 808.

Accordingly, on the basis of the evidence as a whole and the rational inferences drawn therefrom, we conclude that the trial court reasonably could have found beyond a reasonable doubt that the defendant assaulted Kramer while Kramer was acting in the performance of his official duties.

The judgment is affirmed.

In this opinion the other judges concurred.