## STATE OF CONNECTICUT *v.* MICHAEL JAY
### (AC 30002)

DiPentima, C. J., and Harper and Mihalakos, Js.

Argued April 13—officially released October 5, 2010

*Jon L. Schoenhorn*, with whom were *Mathew C. Sorokin* and, on the brief, *Martin Karpel*, law student intern, for the appellant (defendant).

*Ronald G. Weller*, senior assistant state's attorney, with whom, on the brief, were *Michael L. Regan*, state's attorney, and *Vincent J. Dooley*, senior assistant state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, Michael Jay, appeals from the judgment of conviction, rendered following a jury trial, of one count of evasion of responsibility in the operation of a motor vehicle in violation of General Statutes (Rev. to 2005) § 14-224 (b), one count of assault of public safety personnel in violation of General Statutes (Rev. to 2005) § 53a-167c (a) (5) and two counts of interfering with an officer in violation of General Statutes (Rev. to 2005) § 53a-167a.[1] The defendant claims that (1) the trial court improperly denied his motion to suppress evidence; (2) the court improperly instructed the jury with regard to the crimes of assault of public safety personnel and interfering with an officer; (3) the court improperly instructed the jury with regard to the crime of evasion of responsibility, resulting in a violation of his right to fair notice of

---

[1] The trial court imposed a total effective sentence of four years imprisonment, execution suspended after eighteen months, followed by three years of probation. The jury found the defendant guilty of operating a motor vehicle while under the influence of intoxicating liquor or drugs in violation of General Statutes (Rev. to 2005) § 14-227a, but the court set aside the defendant's conviction of this offense.

the conduct prohibited by the evasion of responsibility statute and his right against self-incrimination; and (4) his conviction of the crimes of assault of public safety personnel and interfering with an officer violated the constitutional prohibition against double jeopardy. We affirm the judgment of the trial court.

At trial, the state presented evidence in support of the following facts. On the evening of February 2, 2006, the defendant was at a bar in Oakdale with his girlfriend, Heather Fernald, and a friend, Anthony Gilmore. The defendant consumed alcoholic beverages at the bar. Upon leaving the bar at about midnight, the defendant drove his automobile, with Fernald and Gilmore as passengers, on Forsyth Road in Salem. Soon thereafter, the defendant lost control of his automobile, and it collided with wooden guardrails along the road. This collision caused damage to the guardrails and to the automobile. During the incident, Fernald attempted to get out of the automobile, and became pinned between the automobile and a guardrail post. Fernald screamed loudly. After she was freed, Fernald walked away from the automobile unassisted. At the scene, the defendant exited the automobile and, after inspecting the automobile, tossed the front bumper of his automobile, which had become partially detached during the collision, into a nearby wooded area. Shortly thereafter, Fernald, operating the defendant's automobile, drove the defendant and Gilmore to the defendant's residence. Later, Fernald departed from the defendant's residence with Gilmore.

John Vitello, an eyewitness at the scene of the collision, notified the police. Christopher Burns, a state police trooper, arrived at the scene at approximately 1:30 a.m. on February 3, 2006. Vitello told Burns that the automobile had left the scene. Vitello also stated that, following the collision, he heard a female screaming and that he observed the female bent over, holding

her side and crying. At the scene, Burns observed the damaged guardrails, a shoe, two beer bottles and the front bumper of the defendant's automobile. Burns readily observed one of the defendant's license plates attached to the bumper. After obtaining the defendant's address by means of the license plate, Burns immediately proceeded to the defendant's residence.

Burns and his fellow state police Trooper James Olson arrived at the residence, where they observed the defendant's automobile. They observed that the automobile was missing its front bumper and that the rear license plate matched the license plate discovered by Burns at the scene of the collision. The troopers, identifying themselves as "state police," knocked on the defendant's front door for several minutes, but nobody answered the door. Also, a police dispatcher called the telephone at the residence, but nobody answered the call.

Burns, concerned for the safety of the occupants of the automobile and identifying himself as "state police," entered the residence through the unlocked front door. While inside the residence, he observed a shoe that matched the one he had found at the crash scene. Burns discovered the defendant, who appeared to be intoxicated, lying on a bed in the residence. When Burns and Olson were unable to wake the defendant, who appeared to have difficulty breathing, they called for emergency medical personnel. After medical personnel arrived on the scene and attempted to awaken the defendant, the defendant awoke and became very agitated. Using profane language, the defendant ordered the troopers and the medical personnel to leave his residence. The defendant declined medical treatment. The troopers asked the defendant to sign the written release indicating that he had declined medical treatment as well as a summons for evasion of responsibility. The defendant refused. Burns told the defendant that

he would leave the residence if the defendant signed the documents. Burns also told the defendant that he had the authority to make a custodial arrest for evasion of responsibility if the defendant did not sign the summons.

The defendant, continuing to express his displeasure with the presence of the troopers and the medical personnel, declined to sign the documents as instructed. Burns attempted to handcuff the defendant, but the defendant resisted and physically struggled with Burns and Olson as they attempted to restrain him. Burns sprayed the defendant with pepper spray during the struggle, and the defendant and Burns fell to the ground. After the troopers handcuffed the defendant, the defendant hurled saliva at Olson two times, leaving his saliva on Olson's leg. Additional facts will be set forth as necessary.

I

First, the defendant claims that the court improperly denied his motion to suppress evidence that the police discovered after they had entered his residence. We need not resolve the defendant's claim that the entry was unlawful because the defendant has not demonstrated that his conviction was tainted by any fruits of the alleged unlawful entry. Accordingly, we reject the defendant's argument that he is entitled to a new trial on the basis of this claim.

The defendant's motion to suppress, filed March 17, 2008, sought the suppression of "all evidence" seized and "all arrests" made at the defendant's home. The defendant argued that the police entered his home without a warrant, in the absence of exigent circumstances, and that evidence was obtained in violation of his state and federal constitutional rights against unreasonable search and seizure. During the suppression hearing, the state presented testimony from Burns, and the defense

presented testimony from Fernald, Gilmore and the defendant. We will set forth the evidence that is relevant and material to the ruling under review.

At the suppression hearing, Burns testified that he responded to the accident scene, where he met with Vitello, who provided him with a written statement. Vitello's statement, admitted into evidence, provides in relevant part: "On [February 3, 2006] at approximately 1:30 a.m., I was traveling eastbound on Forsyth Rd. in Salem when I saw a silver colored 2-door sedan (possibly a Honda) . . . traveling at a high rate of speed westbound on Forsyth Rd. The car lost control on the sharp turn at the Salem/Montville line, after which the car went off the right side of the road and hit a guardrail pole. The car then continued across the road and collided with a guardrail pole off the left side of the road. I heard a female scream real loud after which [time] she got out of the car and began to walk westbound on Forsyth Rd. A Hispanic male got out of the car and followed her, however he got back in the car several minutes later. The operator of the car appeared to be a heavy set, clean shaven, white male with black bushy hair. The driver got out of the car, ripped the bumper off the car, and then got back into the car driving westbound on Forsyth Rd. All of the individuals were behaving abnormally and appeared to be intoxicated." In his written statement, Vitello also provided the automobile's license plate number.

Burns testified that, after he spoke with Vitello, he searched the scene of the collision for physical evidence, at which time he discovered two damaged guardrail posts, empty beer bottles, a shoe and an automobile bumper. Burns testified that the damaged posts had paint on them. Burns testified that, from the license plate attached to the bumper, he learned the defendant's name and address. Burns arrived at the defendant's residence approximately forty-five minutes after Vitello

reported the collision to the police. Upon arriving at the defendant's residence, he observed a silver automobile that exhibited "fresh" body damage. Burns took the bumper that he had retrieved from the crash scene from his police cruiser, held it up to the automobile at the defendant's residence and determined that it belonged to that automobile. Based on his observations and what Vitello had included in his statement, Burns believed that the front end of the defendant's automobile had sustained extensive damage during the collision, the bumper became loose because of the collision and, as a result, the defendant removed it from the automobile.

Burns testified that he and Olson began knocking at the door of the residence. He "heard somebody snoring in the apartment" and announced the presence of "state police" for several minutes, but nobody answered the door. Thereafter, Burns opened the unlocked door and walked inside. Burns testified that, based on the statement that he had obtained from Vitello, the damage he observed to the automobile at the residence and his experience and training, he was concerned for the physical safety of the occupants of the automobile. He stated that, based upon these factors, he "had a reasonable belief that somebody was hurt."

Burns testified that he discovered a shoe inside of the residence that was consistent with the one he had observed at the crash scene. Burns testified that he and Olson observed the defendant, clothed only in a pair of pants, asleep on a bed in a bedroom. Burns and Olson attempted to assess the defendant's physical condition. After the troopers were unable to wake the defendant and observed that "[h]e would stop breathing for several seconds every few minutes," they called for emergency medical personnel. Medical personnel were able to awaken the defendant, who became very belligerent. Burns told the defendant that the police and medical

personnel were at the apartment because of the colli-
sion. The defendant, using profane language, told every-
one to leave and did not answer questions about his
condition. Burns testified that he also was attempting
to ascertain the condition of the female passenger in
the automobile. Following numerous requests by Burns,
the defendant refused to sign a waiver of medical treat-
ment and a summons for evasion of responsibility.
Burns testified that he told the defendant that he had
the option of signing the summons for evasion of
responsibility or being taken into custody. Ultimately,
Burns informed the defendant that he was going to
make a custodial arrest for evasion of responsibility. As
Burns placed handcuffs on the defendant, the defendant
physically struggled with Burns and Olson. Burns testi-
fied that the defendant fell to the floor while resisting
a lawful arrest.

At the suppression hearing, the defendant testified
to the following version of events concerning the night
in question. After he left the bar, he was driving his
automobile when "[a] tire blew out." He did not hit
anything with his automobile, but his bumper, which
was attached to the automobile with fishing line,
became loose during the incident. Fernald attempted
to exit the automobile while it was still moving. The
defendant was inspecting the damage to his tire while
Fernald continued screaming, demanding to be taken
home. When he got home, he locked the door and went
to bed. Thereafter, he awoke to find Burns in his living
room, "going through stuff." The defendant screamed
at Burns, demanding an explanation; Burns responded
by ordering him to turn around, handcuffing him, kick-
ing him to the floor and spraying him with pepper spray.
Burns left the defendant, face down on the floor of
the residence, for approximately thirty minutes. Burns
returned, looked in on the defendant, and left him alone
for another thirty minutes. Afterward, Burns and Olson

entered the residence, followed by emergency medical personnel.[2]

Following the presentation of evidence, the prosecutor argued that the officers' warrantless entry into the defendant's residence was reasonable in light of the fact that Fernald was screaming at the scene of the collision, the police did not observe Fernald upon their arrival at the residence and there was nothing at the defendant's residence to dispel a reasonable suspicion that she had been injured as a result of the collision. The defendant's attorney argued that there were no facts upon which a reasonable person would have suspected that anyone in the residence had been injured and, presumably, was in need of assistance. Furthermore, the defendant's attorney argued, if such facts existed, the police should have left the residence upon finding the defendant alone and merely asleep.

In ruling upon the motion to suppress,[3] the court stated: "The defendant's argument that the police had no right to enter his home under the emergency doctrine

---

[2] At the suppression hearing, Fernald testified that she had screamed at the crash scene because, after she had attempted to exit the automobile, she became pinned between a wooden post and the automobile. Fernald's statement to the police, signed and dated on the night of the accident, was admitted into evidence at the suppression hearing as a prior inconsistent statement under State v. Whelan, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). Therein, Fernald stated that the defendant had been driving while intoxicated prior to the accident and that, after she had exited the automobile, she became pinned between the automobile and a wooden post. Fernald stated, as well, that she began screaming until the defendant moved the automobile, thus, freeing her. Gilmore testified that Fernald had been pinned against the post after the accident, that she had been screaming very loudly for the defendant to stop the automobile and that she had been yelling at the defendant at the scene. There is no evidence that the police were aware of the version of events described by Fernald and Gilmore prior to their entry into the defendant's residence.

[3] The court orally announced its ruling and subsequently signed a typed transcription of its ruling for the record.

is unavailing. . . . Here, the state police were dispatched to the location where an independent witness gave a statement to the trooper that the witness observed the car lose control and hit a guardrail and continue across the road and hit a second guardrail pole. The witness then stated [that] he heard a female 'scream real loud.' The trooper testified [that] he observed one sneaker, some beer bottles, the bumper of the car with the license plate attached, and fresh damage and paint on the guardrail pole, all at the scene.

"The testimony of the defense witnesses, [Fernald and Gilmore], corroborates . . . Vitello's statement that . . . Fernald was screaming, and both defense witnesses stated [that] Fernald had been pinned against the guardrail pole by the defendant's vehicle.

"With this information from the witness and items at the scene, especially the license plates, the police ascertained the owner of the car and went directly to the location, and when no one answered the door, the trooper opened the door and yelled in. It would be remiss for the trooper not to locate the driver and, or, passenger of the vehicle to find out their medical condition based on the information received and items found at the scene.

"The court finds the trooper's testimony credible. The court finds . . . Vitello's statement credible and, therefore, the court finds [that] the police properly and in good faith entered the dwelling without a warrant under the emergency doctrine exception to the warrant requirement. Therefore, the motion to suppress is denied at this time." After Burns testified at trial concerning his belief that an emergency existed at the time he entered the defendant's residence, the defendant asked the court to strike Burns' testimony on the ground

that the entry was unconstitutional. The court denied the defendant's request.[4]

Reiterating materially similar arguments to those he raised at trial, the defendant claims that the facts known to the police at the time of their entry into his home did not support a reasonable belief that an emergency existed related to the physical well-being of any occupant of his automobile. The defendant argues that the warrantless entry into his home violated the federal and state constitutions.[5] We need not resolve that issue, however, because we conclude that the admission of any evidence tainted by the alleged police illegality did not harm the defendant.

"Under the exclusionary rule, evidence must be suppressed if it is found to be the fruit of prior police illegality. . . . Application of the exclusionary rule, however, is not automatic. [E]vidence is not to be excluded if the connection between the illegal police

---

[4] In evaluating the propriety of the court's denial of the motion to suppress, the state urges us to consider not only the evidence presented during the suppression hearing itself, but that presented during the ensuing trial. Insofar as the defendant challenges the court's findings of fact in ruling upon the motion to suppress, this court has a duty to examine the court's findings in light of the whole record. See, e.g., *State* v. *Mullins*, 288 Conn. 345, 362–63, 952 A.2d 784 (2008) ("A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]hen a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights . . . and the credibility of witnesses is not the primary issue, our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence." [Internal quotation marks omitted.]).

[5] Despite asserting that the police violated the federal constitution and "the higher standards of the Connecticut constitution," the defendant does not demonstrate, by means of an independent analysis, that, under the state constitution, he was entitled to greater protection from unreasonable search and seizure. Absent such an analysis, we will confine our review to the federal constitution. See, e.g., *State* v. *Colon*, 272 Conn. 106, 154 n.26, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005).

conduct and the discovery and seizure of the evidence is so attenuated as to dissipate the taint . . . . [N]ot all evidence is fruit of the poisonous tree simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which [the] instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint. . . . The initial determination is, therefore, whether the challenged evidence is in some sense the product of illegal government activity." (Citations omitted; internal quotation marks omitted.) *State* v. *Spencer*, 268 Conn. 575, 599–600, 848 A.2d 1183, cert. denied, 543 U.S. 957, 125 S. Ct. 409, 160 L. Ed. 2d 320 (2004). "While the violation of certain constitutional rights automatically amounts to harmful error . . . the violation of others, such as the admission of evidence obtained in violation of the Fourth Amendment, does not. . . . The harmlessness of an error depends upon its impact on the trier and the result . . . and the test is whether there is a reasonable possibility that the improperly admitted evidence contributed to the conviction." (Citations omitted; internal quotation marks omitted.) *State* v. *Shifflett*, 199 Conn. 718, 751–52, 508 A.2d 748 (1986).

We carefully have examined the information and evidence that was the fruit of the entry into the defendant's residence. We have examined this information and evidence in light of the crimes of which the defendant stands convicted, namely, evasion of responsibility, assault of public safety personnel and interfering with an officer. To demonstrate harm, it must be shown that the defendant's conviction was, in an actual sense, aided by the alleged police illegality.

With regard to the conviction for evasion of responsibility, it is not reasonably possible that the evidence and

information that was the fruit of the alleged illegality contributed to the defendant's conviction. The state proved its case with regard to this crime with strong and ample evidence that was obtained by the police prior to the time that they entered the defendant's residence. This evidence included Vitello's statement, especially his description of the driver of the automobile involved in the collision; the observations of the police at the scene of the collision; the bumper from the defendant's automobile with the defendant's license plate attached; and the observations made by the police of the defendant's damaged automobile parked outside of his residence. Also, we are mindful that the defendant's identity as the driver of the automobile at the time in question was not a disputed issue of fact; the defendant testified at trial that he had been operating his automobile on Forsyth Road at the time in question when an "[e]xtremely bald" tire on his automobile "blew out," causing his automobile to spin around.[6]

The other crimes at issue, assault of public safety personnel and interfering with an officer, stand on different footing. Our careful review of the record leads us to conclude that these crimes fall under the new crime exception to the exclusionary rule adopted by our Supreme Court in *State* v. *Brocuglio*, 264 Conn. 778, 788, 826 A.2d 145 (2003). In *Brocuglio*, the court stated: "Several rationales have been advanced for application of the new crime exception: (1) the defendant has a diminished expectation of privacy in the

---

[6] We recognize that, upon entering the defendant's residence, Burns observed a shoe that matched the one he observed at the scene of the collision. In light of the other evidence presented, and mindful that evidence concerning the shoe arguably bolstered the state's case to some extent, we do not conclude that evidence related to the shoe may be said to have contributed to the conviction for evasion of responsibility. Stated otherwise, we are not persuaded that, absent evidence related to the shoe, the trier would have reached a different verdict.

presence of police officers; (2) the defendant's intervening act is so separate and distinct from the illegal entry so as to break the causal chain; and (3) the limited objective of the exclusionary rule is to deter unlawful police conduct—not to provide citizens with a shield so as to afford an unfettered right to threaten or harm police officers in response to the illegality." Id. Affording the issue plenary review; id., 786; we conclude that these crimes, as they were alleged to have been committed, were sufficiently attenuated from the alleged illegal entry by the police that they fall under the new crime exception. In support of our conclusion, we rely upon the evidence that the conduct underlying the conviction for these crimes occurred well after the time of the police entry; by the time of their commission, the police had identified themselves, announced the purpose of their presence and emergency medical personnel had arrived upon the scene. Before engaging in the criminal conduct at issue, the defendant already had an opportunity to, and did, speak with the police and order the police and emergency medical personnel from his residence. The law does not afford a privilege to challenge, by means of criminal conduct directed toward the police, an unlawful entry into one's home. See id., 793–94. Thus, we conclude that, even if the defendant could prevail on his claim of an illegal entry, the evidence with regard to the crimes of interfering with an officer and assault of public safety personnel would be admissible under the new crime exception.[7] For the foregoing reasons, we reject the defendant's

---

[7] At trial, Burns testified concerning his observations of the defendant after he and Olson had entered his residence, but prior to the time that the defendant had physically struggled with the troopers and had hurled saliva at Olson. Specifically, Burns testified that the defendant appeared to be intoxicated and smelled of alcohol. Certainly, this testimony, the fruit of the police entry, was relevant in proving that the defendant had operated a motor vehicle while intoxicated in violation of General Statutes (Rev. to 2005) § 14-227a. The court, however, set that conviction aside. See footnote 1 of this opinion.

claim that he is entitled to a new trial on the basis of the court's denial of his motion to suppress evidence.

## II

Next, the defendant raises several claims related to the court's instructions concerning the crimes of assault of public safety personnel and interfering with an officer. We conclude that these claims are meritless, and will address each one in turn.

As a preliminary matter, we observe that the defendant did not preserve any of these claims of instructional error for our review by means of a written request to charge or by taking an exception to the charge in a timely manner. See Practice Book § 42-16.[8] The defendant affirmatively seeks review of these claims under the doctrine set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[9] We afford review to these claims because the record is adequate for review and the claims are either directly or closely related to the court's instructions as to the essential elements of

[8] "An appellate court shall not be bound to consider error as to the giving of, or the failure to give, an instruction unless the matter is covered by a written request to charge or exception has been taken by the party appealing immediately after the charge is delivered. Counsel taking the exception shall state distinctly the matter objected to and the ground of exception. The exception shall be taken out of the hearing of the jury." Practice Book § 42-16. As our Supreme Court has observed, "[t]he purpose of the rule is to alert the court to any claims of error while there is still an opportunity for correction in order to avoid the economic waste and increased court congestion caused by unnecessary retrials." (Internal quotation marks omitted.) *State* v. *Miller*, 186 Conn. 654, 658, 443 A.2d 906 (1982).

[9] Under *Golding*, a party "can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

the crimes. See *State* v. *DeJesus*, 260 Conn. 466, 472–73, 797 A.2d 1101 (2002) ("[a]n improper instruction on an element of an offense . . . is of constitutional dimension" [internal quotation marks omitted]).[10]

"The standard of review for claims of instructional impropriety is well established. [I]ndividual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . . In other words, we must consider whether the instructions [in totality] are sufficiently correct in law, adapted to the issues and ample for the guidance of the jury." (Internal quotation marks omitted.) *State* v. *Wallace*, 290 Conn. 261, 272–73, 962 A.2d 781 (2009).

A

The defendant claims that the court's instruction for the charge of interfering with an officer was deficient in that, insofar as the court instructed the jury to consider whether an officer was acting in the performance of his duties by using physical force to effectuate an arrest of the defendant, it did not accurately convey the principles codified in General Statutes § 53a-22 (a).

---

[10] In the alternative, the defendant argues that plain error exists as to each claim. Having reviewed the claims under *Golding*, we are not persuaded that plain error exists as to any of the claims.

We carefully have reviewed the instructional language challenged by the defendant as well as the language of § 53a-22 (a). Essentially, the defendant, by highlighting portions of the court's instructions concerning the use of force by the police to arrest the defendant, suggests that the court improperly conveyed that the use of force by the police was legally proper if the police acted under the reasonable belief that the defendant had committed a crime. The defendant also argues that the court failed "to restrict such force to what was, in fact, necessary to overcome actual resistance to arrest." Our review of the court's charge reflects that the court instructed the jury, in relevant part, that "[a] peace officer's use of force to effect [an] arrest is justified only so far as he reasonably believes that a person has committed an offense." The court, however, further explained that a reasonable belief, if mistaken, did not justify the use of force. The court stated: "[I]f a peace officer was mistaken that the actions of a person constituted an offense, the peace officer would not be justified in the use of physical force to make an arrest." Viewing the instruction in its entirety, we do not conclude that it possibly misled the jury in this regard.

Furthermore, the defendant argues that the court failed to instruct the jury with regard to what degree of force legally was justified to overcome resistance to arrest. The defendant asserts that "the court wrongly charged that police are free to wield force with impunity when making an arrest." Our review of the court's instructions, however, reflects that the court unambiguously conveyed to the jury that the police were entitled to use only that degree of physical force necessary to arrest the defendant. The court stated: "In determining whether an officer was acting in the performance of his duties, you must consider another provision in our law that justifies the use of physical force by officers

in making an arrest. That statute provides that a peace officer is justified in using physical force upon another person when *and to the extent* that he reasonably believes such to be necessary to effect an arrest of a person whom he reasonably believes to have committed an offense . . . ." (Emphasis added.) Later, the court highlighted that the jury had to determine whether that degree of force used by the police was reasonable. The court stated: "If you find that the force used by the officer was not reasonable, you will find that [he] was not acting within the performance of his official duties while attempting to arrest the defendant." On the basis of these instructions, we conclude that the court accurately instructed the jury with regard to determining what degree of force was lawful. It is not reasonably possible that the jury was misled with regard to this point of law.

For the foregoing reasons, the defendant is unable to demonstrate that, with regard to the instructional claim related to the officer's use of force to effect his arrest, a constitutional violation clearly exists and clearly deprived him of a fair trial.

B

Next, the defendant claims that, with regard to the crimes of assault of public safety personnel and interfering with an officer, the court improperly failed to instruct the jury with regard to "the defendant's right to physically resist an illegal police entry and the excessive use of force [by the police]." The claimed error is related to the sufficiency of the court's instructions as to whether, at the time that the crimes allegedly were committed, the police were acting in the performance of their duties. We disagree that the court's instructions were improper.

In *State* v. *Brocuglio*, supra, 264 Conn. 793–94, our Supreme Court recognized that a person possesses "[a]

common-law privilege to challenge an unlawful entry into [his or her] home . . . to the extent that a person's conduct does not rise to the level of a crime." In *State* v. *Davis*, 261 Conn. 553, 567–68, 804 A.2d 781 (2002), our Supreme Court recognized that, although a person does not have a privilege to resist an arrest, he or she has a common-law privilege to resist egregiously unlawful police conduct during the course of the arrest.

It is the defendant's contention that, although he did not request an instruction related to these privileges, the court, in instructing the jury as to the essential elements of the crimes at issue, had an obligation to instruct the jury to consider whether these privileges applied to his conduct at issue. At trial, the defendant attempted to demonstrate that the police had entered his residence illegally, without a warrant and in the absence of an emergency, and that, once inside his residence, the police illegally had used force against him. Both the state and the defense presented evidence that the defendant was asleep at the time that the police entered the residence. The defendant testified that he awoke to find Burns inside of his residence and that, after he confronted Burns verbally, Burns used physical force against him. The defendant did not testify that he had used any degree of physical force to resist any police conduct; he testified that Burns asked him to turn around and, after he complied, Burns kicked him, causing him to fall to the ground. After he was on the ground, Burns handcuffed him and sprayed him with pepper spray. Thus, under the facts of this case, viewed in the light most favorable to the defendant's claim, we do not conclude that the court's instructions, if improper, were harmful to the defendant. Stated otherwise, the defendant has not demonstrated that instructions related to the privilege to resist an illegal entry or to the privilege to resist egregiously unlawful police

conduct were warranted in light of the evidence presented at trial. Accordingly, the defendant has not demonstrated that a constitutional violation clearly exists that clearly deprived him of a fair trial.

C

Next, the defendant claims that the court's instructions as to the crimes at issue were deficient in that the court did not "explain the defendant's right to verbally protest the actions of the [police]." The defendant asserts: "Because [the defendant's] verbal protests were both lawful and constitutional, the court's failure to explain the distinction between lawful protest and resistance on the one hand, and unlawful activity on the other, exacerbated by the contradictory instructions on when police may use force on an arrestee, resulted in a charge that likely misled the jury." We disagree.

There was ample evidence, from the state and the defense, that the defendant forcefully asked the police to leave his residence and that the defendant had used profanity in speaking with the persons who had entered his residence. At trial, the defendant did not request an instruction related to a privilege verbally to protest any police conduct. Moreover, our review of the information, the state's argument before the jury and the court's instructions plainly reflects that the words that the defendant spoke during his interactions with the police were not the factual basis of the crimes at issue; the crimes at issue arose from the defendant's physical conduct. Thus, on this record, we do not conclude that the instruction at issue legally was relevant to any issue before the jury or that the failure to deliver the instruction possibly misled the jury in its consideration of the essential elements of the crimes at issue. Accordingly, we conclude that the defendant has not demonstrated that a constitutional violation clearly exists that clearly deprived him of a fair trial.

## D

Finally, the defendant claims that, in its instructions concerning the charges of interfering with an officer, the court improperly instructed the jury with regard to General Statutes § 53a-23, by instructing the jury as follows: "A person is not permitted to use physical force to resist being arrested even if that person sincerely believes that the arrest is unwarranted by a reasonably identifiable peace officer." The defendant does not disagree with the applicability of the principle codified in the statute but argues that the court's manner of explaining the statute had the effect of misleading the jury. With regard to the portion of the court's instruction quoted above, the defendant asserts: "This instruction . . . assumed that the defendant here used force, although he testified in contrast, that he complied with the trooper's order to turn around, and that while applying handcuffs, the trooper kicked [his] bad leg out and [he] fell to the ground. The defendant then screamed in pain as the trooper jerked [him] up by one arm." (Internal quotation marks omitted.) The defendant argues that, in light of the fact that he denied using any degree of force to resist the conduct of the police, the court's instruction was improper because it did not direct the jury to determine *whether or not* he used force to resist the police conduct, but usurped the jury's fact-finding function and instructed the jury *that he had used such force*. The defendant argues that, in this regard, the instruction ran afoul of *State* v. *Sitaras*, 106 Conn. App. 493, 942 A.2d 1071, cert. denied, 287 Conn. 906, 950 A.2d 1283 (2008).

Our review of the instruction as a whole reveals that it is not reasonably possible that the jury would have interpreted the court's instruction to convey the court's belief that the defendant had used force to resist the conduct of the police. Neither the portion of the instruction that is the focus of the defendant's claim, nor any

other related portion of the charge reasonably may be interpreted to suggest that the defendant had used force to resist arrest.

The court's instruction in the present case is readily distinguishable from the instruction at issue in *Sitaras*, upon which the defendant relies. In *Sitaras*, the trial court, instructing the jury concerning the use of physical force to resist arrest, stated in relevant part: "Lastly, the fact that the defendant thought that the attempted arrest was wrongful or that the defendant may have thought that the peace officer was acting unlawfully is no defense to the defendant's use of force, which was unjustified." (Internal quotation marks omitted.) Id., 505. The defendant in *Sitaras* claimed that the trial court improperly had conveyed to the jury its belief that the defendant had, in fact, improperly used physical force to resist arrest, despite the fact that this was a material issue in the case and a contested issue of fact at trial. Id. This court, under the unique circumstances of the case, concluded that the trial court had not violated the defendant's constitutional rights. Id., 507. This court, however, exercised its supervisory powers, directing the trial courts to avoid instructional language of a similar nature "that could create an inference that a defendant used force and consequently runs the risk of usurping the fact-finding province of the jury [concerning] the defendant's use of force . . . ." (Internal quotation marks omitted.) Id.[11] Because we conclude that the court in the present case did not suggest, either directly or inferentially, that the defendant had used force to resist arrest, we readily distinguish this claim from that addressed in *Sitaras*.

For the foregoing reasons, we disagree that the claimed instructional error exists. The defendant has

[11] We observe that the court delivered its instructions in the present case on March 20, 2008. This court officially released its decision in *Sitaras* on March 25, 2008.

not demonstrated that a constitutional violation clearly exists that clearly deprived him of a fair trial, and the claim fails under *Golding*'s third prong.

III

Next, the defendant raises several claims with regard to the court's instruction for the crime of evasion of responsibility in the operation of a motor vehicle in violation of § 14-224. First, the defendant claims that the court improperly instructed the jury that, to demonstrate the defendant's criminal culpability, the state did not need to prove that he had knowledge that the accident at issue had caused property damage. Second, the defendant claims that the court's instructions had the effect of rendering § 14-224 unconstitutionally vague as applied to him. Third, the defendant claims that the application of the statute to him violated his right against self-incrimination. We disagree with all of these contentions.

With regard to the charge of evasion of responsibility, the court charged the jury, in relevant part, as follows: "The first charge the defendant is charged with in count one is evading responsibility in the operation of a motor vehicle. The statute in evading reads in pertinent part, each person operating a motor vehicle who is knowingly involved in an accident which causes damage to property shall at once stop and render such assistance as needed and shall give his name, address and operator's license number and registration to any officer or witnesses to the accident or owner of the property.

"For you to find the defendant guilty of this charge, the [state] must have proven the following elements beyond a reasonable doubt. Element one, the defendant operated a motor vehicle. That's the first element. The defendant operated a motor vehicle, and a motor vehicle means any vehicle used on a public highway, and that includes a car or automobile. A person operates a

motor vehicle within the meaning of the statute when, while in the vehicle, that person intentionally does any act or makes use of any mechanical or electrical agency that, and, or, in sequence will set into motion the mode and power of a vehicle. A person acts intentionally with respect to conduct when his conscious objective is to engage in such conduct. In other words, driving. That is the long legal way of saying someone is driving.

"Element two, knowingly involved in an accident. The second element is [that] the defendant was knowingly involved in an accident. It is only necessary that the state prove that there had been an accident and the defendant knew of this accident. It's not necessary that the state prove the defendant had knowledge of any resulting damage to property.

"The third element is that the accident caused damage to property. That means that the damage to the property was the result of the accident. To define damage in this case, it's injury or harm that reduces the value or usefulness of something.

"The fourth element: failed to stop or render assistance and provide information. The fourth element is [that] the defendant did not stop at once and did not give his name, address, operator's license number and registration number to either the owner of the property, a witness to the accident or an officer. If, for any reason or cause, the defendant was unable to provide the required information at the scene of the accident, the law required him to immediately report the accident to a law enforcement officer or at the nearest police station.

"So, in conclusion for that charge, the state must have proven beyond a reasonable doubt that the defendant operated a motor vehicle, he knew he had been involved in an accident, the accident caused damage to property and the defendant did not stop at once and give his

name, address, operator's license number and registration number to either the owner of the property, a witness to the accident or an officer.

"If you unanimously find that the state has proved beyond a reasonable doubt each of the elements of evading responsibility, then you should find the defendant guilty. On the other hand, if you unanimously find that the state has failed to prove beyond a reasonable doubt any of the elements, you shall then find the defendant not guilty."

A

First, we address the claim that the court improperly instructed the jury that the state need not prove that the defendant had knowledge that property damage resulted from the accident. The defendant did not preserve this claim for appellate review but seeks review under *Golding*. We will review the claim because the record is adequate for review and the claim is related to the court's instruction as to an essential element of the crime. In reviewing this claim, we apply the standard of review set forth in part II of this opinion.

We reject the defendant's claim because the defendant has not demonstrated that the court's instruction possibly misled the jury as to the essential elements of the crime. The defendant urges us to conclude that § 14-224 requires a showing by the state that he failed to meet the reporting requirements required by the statute *while knowing that the accident at issue had caused damage to property*. The defendant takes issue with the court's instruction insofar as it instructed the jury to determine whether the defendant had failed to satisfy the reporting requirement of the statute *while knowing only that he had been involved in an accident*. We readily reject the claim of instructional error; our Supreme Court has interpreted § 14-224 and, specifically, resolved the issue of what proof of mental state

is required for the commission of the crime. In *State v. Johnson*, 227 Conn. 534, 543–44, 630 A.2d 1059 (1993), the court concluded that § 14-224 (b) required a showing that the defendant failed to take the steps required by the statute while knowing that he had been involved in an accident; the court held that the statute "require[d] knowledge of the accident alone." Id., 544. Plainly, the court rejected the interpretation of the statute that is advanced in the present claim, stating: "[T]o establish a violation of § 14-224 (b), the state is not required to prove that the defendant knew that the accident in which he was involved caused injury or damage to property." Id., 545. Accordingly, the defendant cannot prevail under *Golding* because he has not demonstrated that a constitutional violation clearly exists that clearly deprived him of a fair trial.

B

Next, the defendant claims that the court's instruction rendered § 14-224 unconstitutionally vague as applied to him.[12] The defendant raised this issue before the trial court by way of a motion for a new trial, which the court denied. The defendant asserts that the state did not present any evidence that he knew the accident had caused damage to anything other than his own automobile. Further, the defendant asserts that, by its instructions to the jury, the court conveyed to the jury "that the defendant's lack of knowledge of damage to property was no defense to the crime charged, and that the state needed to prove only that the defendant knew an accident occurred." The defendant does not claim that the statute is void facially, but that, as applied, it was unconstitutionally vague because it did not give him fair warning that, despite the fact that he did not

[12] Despite couching his claim in terms of rights afforded by the federal and state constitutions, the defendant has not separately analyzed his claim under the state constitution. Accordingly, our analysis is limited to the federal constitution. See footnote 5 of this opinion.

have knowledge that property damage resulted from the accident, his failure to report the accident violated the statute. Stated otherwise, the defendant asserts that the statute did not give him fair warning that, legally, he was obligated to report an accident which, he believed, had not resulted in any property damage.

"The determination of whether a statutory provision is unconstitutionally vague is a question of law over which we exercise de novo review. . . . In undertaking such review, we are mindful that [a] statute is not void for vagueness unless it clearly and unequivocally is unconstitutional, making every presumption in favor of its validity. . . . To demonstrate that [a statute] is unconstitutionally vague as applied to him, the [defendant] therefore must . . . demonstrate beyond a reasonable doubt that [he] had inadequate notice of what was prohibited or that [he was] the victim of arbitrary and discriminatory enforcement. . . . [T]he void for vagueness doctrine embodies two central precepts: the right to fair warning of the effect of a governing statute . . . and the guarantee against standardless law enforcement. . . . If the meaning of a statute can be fairly ascertained a statute will not be void for vagueness since [m]any statutes will have some inherent vagueness, for [i]n most English words and phrases there lurk uncertainties. . . . References to judicial opinions involving the statute, the common law, legal dictionaries, or treatises may be necessary to ascertain a statute's meaning to determine if it gives fair warning. . . .

"The United States Supreme Court has set forth standards for evaluating vagueness. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair

warning. . . . [A] law forbidding or requiring conduct in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates due process of law. . . .

"Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory applications. . . . Therefore, a legislature [must] establish minimal guidelines to govern law enforcement. . . .

"Tempering the foregoing considerations is the acknowledgment that many statutes proscribing criminal offenses necessarily cannot be drafted with the utmost precision and still effectively reach the targeted behaviors. Consistent with that acknowledgment, the United States Supreme Court has explained: The root of the vagueness doctrine is a rough idea of fairness. It is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited. . . . Simply put, [w]hile some ambiguous statutes are the result of poor draftsmanship, it is apparent that in many instances the uncertainty is merely attributable to a desire not to nullify the purpose of the legislation by the use of specific terms which would afford loopholes through which many could escape." (Citations omitted; internal quotation marks omitted.) *State* v. *Winot*, 294 Conn. 753, 758–61, 988 A.2d 188 (2010).

We conclude that § 14-224 (b), by its plain terms, affords notice that a person must take the steps of

reporting an accident set forth in the statute when *he or she knows they have been involved in an accident* and such accident causes physical injury to any other person or injury or damage to property. The defendant attempts to demonstrate that it is arbitrary and unfair to interpret the statute, under the facts of this case, such that the lack of knowledge that property damage has occurred is not a defense to the charge. Reference to judicial interpretation of the statute, as set forth above, readily defeats the defendant's interpretation of the statute. See *State* v. *Johnson*, supra, 227 Conn. 544–45. We are not persuaded that the statute afforded inadequate notice of the prohibited conduct that underlies the defendant's conviction or that the defendant's conviction gives rise to any issues of fairness based upon statutory ambiguity. Accordingly, the defendant has not demonstrated that a constitutional violation exists.

## C

Next, the defendant claims that the application of § 14-224 (b), under the circumstances of this case, violated his right against self-incrimination.[13] We disagree.

Section 14-224 (b) provides in relevant part: "Each person operating a motor vehicle who is knowingly involved in an accident which causes physical injury . . . to any other person or injury or damage to property shall at once stop and render such assistance as may be needed and shall give his name, address and operator's license number and registration number to the person injured or to the owner of the injured or damaged property, or to any officer or witness to the

---

[13] The defendant raised this claim during argument related to his motion for a new trial. As stated earlier in this opinion, the court denied that motion. Also, we observe that, despite alleging a violation of his state and federal constitutional rights, the defendant does not separately analyze this claim under the state constitution. Accordingly, our analysis is limited to the federal constitution. See footnote 5 of this opinion.

physical injury to person or injury or damage to property, and if such operator of the motor vehicle causing the physical injury of any person or injury or damage to any property is unable to give his name, address and operator's license number and registration number to the person injured or the owner of the property injured or damaged, or to any witness or officer, for any reason or cause, such operator shall immediately report such physical injury of any person or injury or damage to property to a police officer, a constable, a state police officer or an inspector of motor vehicles or at the nearest police precinct or station, and shall state in such report the location and circumstances of the accident causing the physical injury of any person or the injury or damage to property and his name, address, operator's license number and registration number."

The defendant argues that the application of § 14-224 (b) to the facts of this case required that he "find and drive to a police station in the middle of the night, confess his involvement in a motor vehicle accident and essentially admit to wrongdoing" although he was unaware of any damage to anyone else's property. In asserting that an infringement of his right against self-incrimination has occurred, the defendant takes issue with that portion of § 14-224 (b) that requires a person knowingly involved in an accident who, for any reason or cause, "is unable to give his name, address and operator's license number and registration number to the person injured or the owner of the property injured or damaged, or to any witness or officer . . . ." General Statutes (Rev. to 2005) § 14-224 (b). Under § 14-224 (b), such person immediately must report "the location and *circumstances of the accident* . . . and his name, address, operator's license number and registration number" to one of the persons described in the statute.

(Emphasis added.) General Statutes (Rev. to 2005) § 14-224 (b). Essentially, the defendant asserts that this portion of § 14-224 (b), requiring him to report the *circumstances of the accident*, "require[d] that he must implicate himself in wrongdoing . . . ."

The defendant's claim warrants little discussion. The state did not charge the defendant with violating the statute because he did not report *the circumstances of the accident* to one of the persons identified in the statute. Moreover, as a review of the court's instruction concerning § 14-224 (b) makes readily apparent, the court did not instruct the jury that criminal liability attached to the defendant's failure to report *the circumstances of the accident* to anyone. Rather, the court instructed the jury to consider whether the defendant, acting with the mental state required for the commission of the crime, failed, either at the scene of the accident or immediately thereafter, to provide *the identifying information* set forth in the statute. The defendant does not assert that the requirement that he provide this information, which included the defendant's name, address, operator's license number and registration number, violated his constitutional rights.[14] On this basis, we reject the defendant's claim.

## IV

Finally, the defendant claims that his conviction under count three of assault of public safety personnel in violation of § 53a-167c (a) (5) and his conviction under count four of interfering with an officer, Olson,

[14] The defendant, in his brief, appears to acknowledge that the statutory requirement that he provide such identifying information does not violate his right against self-incrimination. In this regard, we refer to the defendant's discussion of *California* v. *Byers*, 402 U.S. 424, 432–34, 91 S. Ct. 1535, 29 L. Ed. 2d 9 (1971) (holding that certain reporting requirements incident to lawful activities are not testimonial in fifth amendment sense and do not risk self-incrimination).

in violation of § 53a-167a violated the constitutional prohibition against double jeopardy.[15] We disagree.

"The double jeopardy clause of the fifth amendment to the United States constitution provides: [N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb . . . . The double jeopardy clause is applicable to the states through the due process clause of the fourteenth amendment. . . .

"We have recognized that the [d]ouble [j]eopardy [c]lause consists of several protections: It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense. . . . These protections stem from the underlying premise that a defendant should not be twice tried or punished for the same offense. . . . The issue before us concerns the last of these protections, multiple punishments for the same offense in the context of a single trial. Double jeopardy analysis in the context of a single trial is a two-step process. First, the charges must arise out of the same act or transaction. Second, it must be determined whether the charged crimes are the same offense. Multiple punishments are forbidden only if both conditions are met. . . . The traditional test for determining whether two offenses are the same offense for double jeopardy purposes was set forth in *Blockburger* v. *United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932). [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other

---

[15] The defendant alleges a violation of his rights under the state and federal constitutions. As his analysis is devoid of a separate analysis under the state constitution, we will confine our analysis to the federal constitution. See footnote 5 of this opinion.

does not. . . . In conducting this inquiry, we look only to the relevant statutes, the information, and the bill of particulars, not to the evidence presented at trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Nelson*, 118 Conn. App. 831, 852–53, 986 A.2d 311, cert. denied, 295 Conn. 911, 989 A.2d 1074 (2010).

As a preliminary matter, we readily conclude that both charges arose from the same act or transaction. The information charging the defendant with both crimes alleges that they were committed on the same date (February 3, 2006), at the same time (approximately 1:45 a.m.), at the same location (the defendant's residence in Salem) and involved the same victim (Olson). We must determine, therefore, whether the two crimes constitute the same offense.

Count three of the information, charging the defendant with assault of public safety personnel in violation of § 53a-167c (a) (5), states that "on or about February 3, 2006, at about 1:45 a.m., at [the defendant's residence], the [defendant], with the intent to prevent a reasonably identifiable peace officer, to wit, Trooper Olson . . . from performing his duties and while such officer was acting in the performance of his duties, did hurl saliva at such peace officer . . . ." Section 53a-167c (a) provides in relevant part: "A person is guilty of assault of public safety or emergency medical personnel when, with intent to prevent a reasonably identifiable peace officer . . . from performing his or her duties, and while such peace officer . . . is acting in the performance of his or her duties . . . (5) such person throws or hurls . . . any bodily fluid including, but not limited to, urine, feces, blood or saliva at such peace officer . . . ."

Count four of the information, charging the defendant with interfering with an officer in violation of § 53a-167a, states that "on or about February 3, 2006, at about

1:45 a.m., at [the defendant's residence], the [defendant] did obstruct, resist, hinder, and endanger a peace officer, to wit, Trooper Olson . . . in the performance of his duties . . . ." Section 53a-167a (a) provides in relevant part: "A person is guilty of interfering with an officer when such person obstructs, resists, hinders or endangers any peace officer . . . in the performance of such peace officer's . . . duties."

Our careful review of the distinct statutory provisions with which the defendant was charged, as well as the manner in which the state alleged that the defendant committed the crimes at issue, leads us to conclude that each provision requires proof of a fact that the other does not. To sustain a conviction under count three for assault of public safety personnel, the state bore the burden of proving beyond a reasonable doubt that the defendant hurled saliva at Olson. To sustain a conviction under count four for interfering with an officer, however, the state bore the burden of proving beyond a reasonable doubt that the defendant obstructed, resisted, hindered or endangered Olson in some manner. Proof that the defendant hurled saliva at Olson does not necessarily constitute proof that the defendant obstructed, resisted, hindered or endangered Olson, as the defendant suggests. Based solely upon the statutory provisions at issue and the counts set forth in the information, we conclude that it is theoretically possible for the defendant to have spit at Olson without having obstructed, resisted, hindered or endangered Olson in any manner. The act of hurling saliva does not, as a matter of law or logic, necessarily obstruct, resist, hinder or endanger another. Accordingly, we reject the defendant's claim that the two offenses were the same offense for double jeopardy purposes.

In reaching our conclusion, we distinguish the present case from *State* v. *Flynn*, 14 Conn. App. 10, 14–21, 539 A.2d 1005, cert. denied, 488 U.S. 891, 109 S. Ct. 226,

102 L. Ed. 2d 217 (1988), upon which the defendant heavily relies. In *Flynn*, the defendant was convicted, under one count, of interfering with an officer in violation of General Statutes (Rev. to 1983) § 53a-167a (a) and, under another count, of assault of a peace officer in violation of General Statutes (Rev. to 1983) § 53a-167c (a) (1) or (2). Id., 16. Section 53a-167c (a) (1), as relevant, required proof that a defendant caused physical injury to a peace officer. Section 53a-167c (a) (2), as relevant, required proof that a defendant "throws or hurls, or causes to be thrown or hurled, any rock, bottle, can or other article, object or missile of any kind capable of causing physical harm, damage or injury, at [a] peace officer . . . ." The defendant claimed, following conviction under both counts, that his separate punishments under both counts constituted multiple punishment for the same offense and, thus, violated the prohibition against double jeopardy. Id., 12. This court agreed with the defendant, concluding that the distinct statutory provisions, as charged, violated *Blockburger* in that one of the crimes at issue was a lesser included offense of another crime and, thus, they constituted the same offense for double jeopardy purposes. Id., 17–19. In reaching this conclusion, the court stated: "Applying the standard of whether each provision requires proof of an additional fact which the other does not, we conclude that a person could not commit the greater offense of assault on a peace officer without having committed the lesser offense of interfering with a peace officer. It is theoretically impossible to have a situation where one, with intent to prevent the performance of duties of a peace officer, either causes physical injury to an officer or throws or hurls a bottle or other object at an officer capable of causing harm without at the same time obstructing, hindering, resisting or endangering that officer in the performance of his duties." Id., 18–19. After determining that a legislative intent to

impose separate punishments for the crimes charged under both counts was not evident, the court concluded that the multiple punishments imposed had violated the prohibition against double jeopardy. Id., 20.

We distinguish the distinct statutory provisions at issue in *Flynn* from those at issue in the present case by virtue of the fact that hurling saliva, while certainly offensive and worthy of criminal punishment in its own right, is materially different from either conduct that causes physical injury or conduct that includes hurling a bottle or other object, *capable of causing harm*, at an officer. As the court in *Flynn* concluded, the latter types of conduct, by their nature, necessarily obstruct, resist, hinder or endanger an officer. We conclude, however, that the former conduct, hurling saliva, does not.

The judgment is affirmed.

In this opinion the other judges concurred.